MATTHEW D. MULLER
1684 Decoto Rd. #274
Union City, CA 94587
PHONE: (415) 322-0492
FAX: (415) 366-3326
matt@projectjusticeforall.org

*In Pro Per*

FILED

May 26 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW D. MULLER, <br> Plaintiff, <br> v. <br> COUNTY OF ALAMEDA, <br> MIGUEL CAMPOS, <br> JOSE BUENROSTRO, <br> KEVAN WOODS, <br> RAFAEL ALVAREZ, <br> DOES 1 to 50, <br> Defendants. | Case No. 20-cv-3516-DMR <br><br> **COMPLAINT FOR DAMAGES** |

## INTRODUCTION

1. This is an action for damages arising from the Defendants' unlawful search seizure and destruction of the Plaintiff's property. Following their unlawful seizures, the Defendants concealed their misconduct by altering judicial documents and forging a magistrate's signature, which tampering has been confirmed and documented by an FBI-trained forensic document expert.

COMPLAINT — - 1 - — *Muller v. County of Alameda*

## JURISDICTION AND VENUE

2. The claims alleged herein arise pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution, and related state law.

3. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

4. Venue is properly in this Court under 28 U.S.C. § 1391(b)(1) because Plaintiffs' claims for relief arose in this District and one or more of the Defendants resides in this District.

## PARTIES

5. Plaintiff MATTHEW MULLER ("MULLER") is the owner and/or possessor of the properties searched and seized as discussed herein, and whose privacy interests were invaded by the Defendants. Mr. MULLER is a resident of Solano County, California.

6. Defendant COUNTY OF ALAMEDA ("COUNTY") is a political and geographical subdivision of the State of California with its principal offices located in the city of Oakland, California. During all relevant times, it employed the other Defendants and was responsible for the policies and customs giving rise to this action.

7. The Defendant COUNTY OF ALAMEDA has at all relevant times been responsible for the actions and/or inaction of the Alameda County Sheriff's Office ("ACSO") and for its policies, procedures, practices and customs.

8. The Defendant MIGUEL CAMPOS is an employee of the Alameda County Sheriff's Office. On information and belief he is a resident of Alameda County.

9. The Defendant KEVAN WOODS is an employee of the Alameda County Sheriff's Office. On information and belief he is a resident of Alameda County.

10. The Defendant JOSE BUENROSTRO is an employee of the Alameda County Sheriff's Office. On information and belief he is a resident of Alameda County.

11. The Defendant RAFAEL ALVAREZ is an employee of the Alameda County Sheriff's Office. On information and belief he is a resident of Alameda County.

12. The injuries suffered by Mr. MULLER, were caused in necessary part by the customs, policies and practices of the COUNTY and its Sheriff's Office. Those customs, policies

and practices are described throughout this complaint, as are their deficiencies and the conditions they created.

13. The Defendants DOES 1 to 50 are persons and entities unknown to Plaintiff who acted individually and in concert with other Defendants to cause the harms described herein.

## FACTS

14. In the underlying criminal matter the Plaintiff was charged with breaking into a home and attempting to rob its occupants. These factual allegations are disputed. However, the violations alleged herein do not necessarily mean the invalidity of the later criminal conviction.

15. As to both agencies, many of the illegalities described herein are practices tolerated and even sanctioned by ACSO officials. Further, it was the practice of the Alameda County District Attorney's Office (DAO) to prosecute cases that they knew to be the fruit of illegal officer conduct, encouraging more such conduct. In some cases as here, the DAO cooperated in concealing illegal conduct by ACSO officers.

16. On June 5, 2015, ACSO officer Christopher Shepard obtained a Samsung smartphone that he believed belonged to a suspect in a home robbery. Shepard dialed 911 from the phone after attempting to unlock and search it. Shepard and the 911 dispatcher contacted Verizon, the provider whose logo was on the back of the phone, to obtain more information about the phone's owner. A Verizon representative said that the information could only be provided if it was needed in an emergency. Shepard advised that it was not an emergency.

17. Shepard did not believe the phone was abandoned. Nor did he believe any exigent circumstances existed that would justify a search. However, he later falsified police reports and testified falsely to create the appearance that his search of the phone was lawful.

18. The phone was received shortly thereafter by ACSO officer Kevan WOODS, though it is believed to have been handled by other ACSO officers including John White. The phone was locked by means of a very simple grid pattern, which WOODS or another quickly guessed, or the lock screen was bypassed by computer forensics techniques. Before obtaining any warrant for the

phone. WOODS and others, believed to include ACSO officer Jose BUENROSTRO, searched the phone and accounts and information located off of the phone on the internet using credentials found on the phone.

19. WOODS found nothing on the phone, or in remote data they accessed using the phone that was inconsistent with the phone having been stolen from or lost by its owner. ACSO officers found information on the phone indicating it belonged to Matthew MULLER.

20. After unlawfully obtaining all information used in their investigation, ACSO officers obtained a warrant to search the phone and Verizon records. The warrant did not include authorization to search any data located off of the phone other than Verizon call records.

21. ACSO officers determined, using information they accessed remotely via the phone, that the phone's owner lived at an address in South Lake Tahoe, California. ACSO officers traveled to that address and/or requested assistance from the El Dorado County Sheriff's Office (EDCSO). Finding nobody home, they searched and/or EDCSO personnel search the home without a warrant.

22. Officers found nothing in the home that implicated Mr. MULLER in the house robbery, aside from common tools and items with innocent uses. Nonetheless, they wished to arrest a suspect, and also wanted to obtain a post hoc warrant to search the house so that they could "launder" any information obtained during the legal search that turned out to support their theory.

23. This was the same strategy as they had used with the found smartphone. ACSO has a custom and practice of incentivizing and/or failing to discipline officers who conduct illegal searches and then use information they harvest to obtain warrants, making it appear as though illegally obtained evidence and information was come by legally. This strategy typically includes falsifications about how an investigation proceeded, and may also include falsified and/or planted evidence. All three tactics were used in this case.

24. Using the phone they found, ACSO officers accessed Matthew MULLER's Yahoo! e-mail account. They falsified an e-mail message to make it appear as though Mr. MULLER had sent himself a "to-do" list. The list they invented made it appear as though Mr. MULLER had committed a home robbery and was now preparing to flee. It included a list of evidence Mr. MULLER was supposedly reminding himself to destroy, such as evidence that would be located

on electronic storage devices. It listed common items such as duct tape and two-way radios in a way that made them appear to be part of illicit activity. It also included a list of survival gear that Mr. MULLER would supposedly take with him and that suggested he was imminently preparing to flea.

25. On June 6, 2015, ACSO officers used this false information to obtain warrants for Mr. MULLER's arrest and for the search not only of the Tahoe property, but also of the home of his elderly mother and step-father in Orangevale, California. The warrant listed items to be searched, such as electronic devices, that ACSO officers included in their falsified "to-do/escape" e-mail.

26. ACSO has a custom and practice of incentivizing and/or failing to discipline officers who falsify evidence or information about electronic devices being involved in offenses, in order to obtain warrants for these devices. It is known to ACSO and to officers that devices such as smartphones contain immense amounts of information. Their tactics of including such devices as purported instruments of a crime allows them to search this extensive trove of information for outside the scope of their investigation — a digital fishing expedition.

27. On the morning of June 8, 2015, a sizeable squad of armed officers raided the Tahoe property. They included ACSO officers Kevan WOODS, Jose BUENROSTRO, Rafael Alverez, Misty Carauso and various others, as well as EDCSO personnel. ACSO officers did not knock and announce their purpose. Instead, they battered down the door, and began yelling incoherently after they had already entered the residence. Officers had no reason to believe they were in danger that would be sufficient to justify an unannounced forced entry. Indeed, officers had already searched the home three days before and knew there were no obvious threats. Mr. MULLER had no firearm registered to him, and although victims of the home robbery gave mixed accounts of seeing a laser dot that could be from a gun sight, they never reported seeing a firearm or being threatened with one. The laser dot one victim saw was reported as being green, which most officers know would be inconsistent with a firearm laser sight — usually red. Mr. MULLER had no record of arrest or conviction for violent crime of any sort, let alone one that involved resisting officers.

28. Mr. MULLER immediately surrendered upon realizing that the armed men invading his house were officers. He was taken into custody without incident, and remained cooperative throughout the encounter.

29. ACSO has a custom and practice of incentivizing or failing to discipline officers who use excessive force and/or unannounced forced entries in executing search warrants or home arrests. This creates a dangerous situation for both officers and occupants of a home being raided.

30. ACSO officers searched the home on the purported authority of a June 8, 2015, warrant they obtained using falsified information and information illegally obtained from the prior unlawful search of the home and found phone. The warrant was invalid on its face, listing the items to be seized as "Any items not limited to…." No further language in the warrant qualified or limited the "any items not limited to …" language. It was a general warrant of unlimited scope to seize "any items," which any reasonable officer would know was not a valid warrant. Further, all ACSO officers executing the warrant knew it had been obtained through illegal means.

31. ACSO officers seized various items from the home. One of these was a white substance, contained in a small plastic bag. Officer WOODS claimed that he tested the substance and determined it to be cocaine. In fact, it was granulated ibuprofen that would not have tested positive for the presence of any illegal drug, as an FBI test later confirmed.

32. On March 18, 2019, WOODS and BUENROSTRO testified concerning the "cocaine." They repeated their story that they had tested the substance and that the test indicated it was cocaine. Mr. MULLER has never used nor possessed cocaine in his life, nor any other illegal drug.

33. ACSO officers seized a wide variety of items, including items such as stereo equipment that had no connection whatsoever to their investigation.

34. Officers next traveled a short distance to a tow yard to search an abandoned stolen vehicle that had been recovered approximately one kilometer from the Tahoe property. ACSO officers then "discovered" items in the vehicle that they had placed there earlier. On information and belief, officers also possessed items taken from the crime scene or other sources to plaint in the

1  vehicle and/or home. In any event, Mr. MULLER knows that specific items were taken from his home and place in the vehicle.

35. Most significantly, officers had earlier obtained Mr. MULLER's California driver's license from his home during the first illegal search on June 5. (Mr. MULLER had other identification and had left the drivers license on a counter in his home). Officers planted the license in the car that had been recovered nearby. They then reported the car as stolen to the California Highway Patrol, inventoried the evidence in the car, presumably not knowing some had been planted.

36. Mr. MULLER is unsure of other details of the recovery of the stolen vehicle officers associated with him, except that various claims made in officers' reports about how the vehicle came to be associated with Mr. MULLER and what items were discovered in it cannot be true.

37. ACSO reports themselves cast doubt on officers' explanations. A report from an ACSO evidence laboratory stated that close inspection of surfaces on the vehicle that would ordinarily hold fingerprints, such as door handles or vehicle controls, contained no prints whatsoever. No prints were found anywhere, indicating the vehicle had been wiped clean. Under ACSO officers' version of events, Mr. MULLER had supposedly carefully wiped clean and removed all fingerprints from the abandoned vehicle so that it would not be associated with him, but then left his driver's license, mail addressed to him, and other evidence sitting in the car.

38. Other than that ACSO officers' account is untrue, Mr. MULLER does not have personal knowledge that explains details such as the wiped-clean vehicle.

39. Also on June 9, 2015, ACSO officer John White and others executed a search warrant at the home of Mr. MULLER's mother. The warrant contained the same unqualified "any items" language and was invalid on its face. Mr. MULLER used the address of his mother's Orangevale home as a permanent mailing address for matters such as student loans, but had no room or property there.

40. White was admitted to the home upon demand, and took Mr. MULLER's mother to her small computer room to question her. She was cooperative and answered several questions, but when White began asking her pointed questions about Mr. MULLER, she stated that she did not

want to answer. White then told Mr. MULLER's 74-year-old mother that if she did not answer his questions, he would begin seizing items from her home. Under duress of having her property seized pursuant to the unlawful general warrant, Mr. MULLER spent nearly an hour answering White's questions.

41. In order to conceal the actual, illegal source of information important to their investigation, officers lied and stated that they learned it from other sources, such as his mother. In particular, they claimed Mr. MULLER's mother provided them with a Yahoo! e-mail address they used in their investigation. Per a body camera recording of her questioning, White obtained Mr. MULLER's phone number from her, but not his e-mail address. At no time did White search her phone or computer. Mr. MULLER's mother did not forward White any messages nor did she log on to an e-mail account and show White anything. She is not a sophisticated electronics user, would not know how to forward a text message or a "screenshot" depicting messages, did not know Mr. MULLER's e-mail address without logging into her account to view it, and did not even communicate with Mr. MULLER via e-mail using the Yahoo! address officers later claimed she gave them.

42. The actual source of officers' knowledge of the Yahoo! address was the illegal phone search. As had been their practice with the phone and the Tahoe property, they next sought a warrant for the e-mail account in order to "paper over" their prior illegal search. As with the e-mail address, they obtained the warrant using illegally obtained information.

43. During the Tahoe search, officers seized various devices including an Apple "Mac Mini" computer. This computer was synchronized to Mr. MULLER's iPhone and Apple account, and contained or could access messages sent to and by Mr. MULLER. Officers used a text message—sent by Mr. MULLER to his mom and discussing and trying to recover the Samsung phone— in connection with their warrant application. That application claimed the officers had obtained the text messages from Mr. MULLER's mother, but this was false. Officers also manufactured a print-out purporting to show a screen-shot of her phone and messages from Mr. MULLER displayed. However, for technical reasons that can be verified by an expert, the

screenshot could not have originated from her phone, as officers claimed it did. No such screenshot was forwarded from the phone, nor any messages from Mr. MULLER.

44. In fact, the text message used in the warrant applications was from the Mac Mini computer that officers had taken either on June 5 or 9, 2015. Given that the computer and certain other evidence could upon inspection reveal officers' unlawful activities, they later decided to alter warrant returns to conceal that the items had ever been seized in the first place.

45. Attached as Exhibit A are pages purporting to be accurate warrant returns listing property seized from the Tahoe residence and the abandoned stolen Ford Mustang. These documents were obtained from court records in August of 2019 by Mr. MULLER's agent. An identical version was also provided to Mr. MULLER by prosecutors in a related Solano County matter.

46. The documents have been compared to exemplars filed the same day and to other warrant returns filed by ACSO officers in this case. They were inspected by forensic specialists including a former FBI forensic document expert who is now practicing privately.

47. Succinctly, the second pages of the two warrant returns provided are likely forgeries. They were forged for the purpose of eliminating records of seized items that officers wished to conceal. The true record would contain those items and other items seized that do not appear on the forged record. The concealment was for purposes of eliminating evidence of unlawful activities by the officers.

48. Warrant documents obtained by or provided to Mr. MULLER contain numerous other anomalies. The judge's initials on the "night service" line of the June 8, 2015, Tahoe warrant are believed to be a forgery, and officers claimed the initials allowed them to make an unannounced forced entry into the Tahoe home. Page 3 of the June 8 application for a warrant to search the Mustang refers back to the June 6 arrest and search warrants that officers sought to eliminate from all records. "On Saturday, June 06, 2015, DPS Detectives secured a Ramey Warrant for Matthew MULLER…. On Saturday, June 06, 2015, DPS Detectives also secured search warrants for the residence of Matthew MULLER…"

49. A printout of a police database warrant abstract provided to the defense indicates that the arrest warrant was issued on "20150608," but on close inspection the numeral '8' is in a different form than other numeral 8's on the document, consistent with that 8 being used to replace another numeral — presumably '6,' making the actual date of issue 20150606. This irregularity has been screened by a document forensic expert and a formal report is pending.

50. ACSO officers testifying at March 18 and 22, 2019, evidentiary hearings denied that any June 6, 2015, warrants were sought or existed. When Rafael ALVAREZ, the affiant for the June 8 Mustang warrant, was asked why his affidavit referred back to warrants obtained on June 6, he replied "I don't know, all of that text was just given to me." However, reports he authored also refer in passing back to search and arrest warrants that were obtained before the June 8, 2015, search and arrest warrants.

51. During question at the March 18, 2019, evidentiary hearing, Mr. MULLER made ACSO officers aware for the first time that he knew of anomalies in the warrant documents and suspected tampering. On March 20, 2019, Mr. MULLER's paralegal Huei Dai visited the Pleasanton courthouse. Ms. Dai had previously visited the courthouse and been allowed to review and obtain a copy of one warrant without incident.

52. On the March 20 visit, the clerk assisting Ms. Dai initially indicated that there would be no problem with her reviewing court records of warrant documents. However, when Ms. Dai began asking for warrant records pertaining specifically to Mr. MULLER's case, the clerk advised that she need to go speak with a supervisor to determine whether Ms. Dai could obtain copies.

53. When the clerk returned, she told Ms. Dai that she would need to be either a law enforcement officer or a licensed investigator to review and obtain copies of the documents. Ms. Dai stated that she had been allowed to review records at the courthouse a few months prior, also stating "aren't these supposed to be public records?" The clerk replied "this is just, you know, a new policy." Ms. Dai asked where this policy was posted or published. The clerk stated "there was an e-mail... it came from the higher... yeah." Ms. Dai was not allowed to obtain copies or review any documents. She was told she could return the next day and speak to a supervisor. Ms. Dai was

told that the supervisor had left for the day, although the clerk had said she spoke to her supervisor just a moment before.

54. Records of the above June 6, 2015, warrants exist in the ACSO warrant database and in other ACSO records systems.

55. Several other items seized from the Tahoe residence appear nowhere in warrant returns of ACSO seized, property records produced to Mr. MULLER. This includes items such as stereo equipment, computer monitors and printers that appears in law enforcement photographs of the premises taken the day it was searched. After the search, Mr. MULLER's parents found none of these items inside the residence.

56. Besides the Mac Mini, the most significant item to have disappeared from the record is a high-security external hard drive. The item contained no data relevant to Mr. MULLER's criminal charges. However, Mr. MULLER was still an attorney at the time of the searches at issue. Although he had stopped practicing some time before, he maintained certain client files on the encrypted drive. It also contained archives of other sensitive data, including records of confidential interviews with issue-advocacy groups and high-level Congressional staff-members conducted as part of a campaign finance study.

57. ACSO officers further concealed their unlawful activities through extensive false statements in police reports, and through post hoc alterations of reports intended to harmonize them with the false investigation story they had devised. Accounts of the investigation tailored to conceal illegalities were, with the knowledge and/or advice of the Alameda County District Attorney's Office.

58. For example, police reports were altered to make it appear as though officers believed there was an exigent need to search the Samsung phone found at the scene of the home robbery. In fact, ACSO officers did not believe that at the time. Incident reports were backdated or altered after their submission by officers Masood Feroz and Shepard. Each of them added an exactly identical paragraph to their reports claiming various circumstances that warranted an exigent search of the phone. The paragraph was provided to them by another ACSO officer or deputy district attorney. However, Shepard testified that the paragraph was his original work that he wrote without

assistance and shared with no other person before entering it in the report, and that Feroz did not copy the paragraph from him. When asked how else a lengthy paragraph in his report and Feroz's could be exactly identical, Shepard testified that law enforcement officers often use the same terminology. He testified that it was mere coincidence that the paragraphs were completely identical.

59.     ACSO has a custom and practice of allowing deputies to alter reports they have submitted. Deputies are able to make changes to a previously submitted report, while making it appear as though the report was originally submitted in that altered form. Standard procedure is to add an amendment or file a supplemental report. But ACSO has chosen to implement a system that allows officers to alter the original report and/or make it appear that a report was created and finalized at a time other than it actually was.

60.     Shepard's report is one of the many examples in this case of reports altered or submitted at times other than that shown on the report. ACSO officers or DA's office personnel sought to conceal this fact. On the morning of June 17, 2015, a batch of reports for this case (ACSO No. D15-01576) was printed for outside review. The batch-print was continuously numbered at the bottom of each page. The order in which the batch report was printed by the system was set according to a database field — likely the data a report was last edited — that caused the sequence of reports to conflict with the dates and times listed on the reports. With the batch of reports continuously paginated, this inconsistency would be apparent. Accordingly, the person printing the reports went to the trouble of printing off each of the 25-page reports individually, beginning at 11:43am. This individual printing suppressed the continuous pagination of the batch print, concealing indicate of how the reports were altered. The individually-printed reports were then arranged according to the dates on the face of the reports, making it appear as though the reports had been finalized and submitted in that order. This was the version of reports provided to Mr. MULLER in discovery. Mr. MULLER has obtained a continuously paginated set of reports from another source.

61.     ACSO also performed illegal digital searches of electronic devices seized under the unlawful June 8, 2015, general warrant for seizure of "all items" at the Tahoe property. On June

1  17, 2015, BUENROSTRO submitted seized electronic devices to the Silicon Valley Regional Computer Forensics Laboratory. Soon after, ACSO officers were able to search most of the devices seized. This effort was led by Misty Carausu, as has been stated in print and in news clips. However, Carausu testified on March 18, 2019, that she is in no way participated in review of digital evidence seized from Mr. MULLER. This was perjury.

62.  ACSO officers continued to make false statements and file false reports as the investigation continued. Detectives falsely claimed that Mr. MULLER was linked to a Vallejo kidnapping by physical evidence they had seized, such as duct tape and zip ties. They made various false statements and omissions about how they interacted with outside agencies, including the FBI and Alameda Police Departments. The focus remained on concealing illegal conduct, the unlawful origins of information used in the investigation, and numerous false statements made by ACSO officers in affidavits and reports — all of which were used to obtain a no contest plea from Mr. MULLER.

## CLAIMS FOR RELIEF

63.  The color-of-law character of the Defendants' actions was pursuant to their employment by, election to contract with, or status as governmental authorities and entities.

64.  Plaintiffs further allege that each of the Defendants assisted, cooperated, coordinated, agreed, and acted in concert with each of the other Defendants to commit and cause the wrongful acts and omissions described herein. Each and every Defendant assisted, coordinated, agreed, and acted in concert with each of the other Defendants to cause, and thereby did cause, the Plaintiffs' injuries.

65.  Plaintiff allege in the alternative that each and every Defendant who is a natural person acted in their official capacity and/or in their individual capacity and/or exceeded the scope of their employment, position, contract, or lawful authority, to include all DOES whose identities are to be ascertained.

# FIRST CAUSE OF ACTION

## VIOLATION OF FOURTH AMENDMENT

66. The Plaintiff hereby realleges and incorporates all preceding paragraphs as if fully set forth herein.

67. The Plaintiff's right to be free from unreasonable searches and seizures is secured by the Fourth Amendment of the U.S. Constitution.

68. Acting under color of law, individually and in concert and pursuant to COUNTY OF ALAMEDA custom and policy, the Defendants deprived the Plaintiff of his Fourth Amendment rights as described above.

69. As a result of this deprivation, the Plaintiff suffered damages.

# SECOND CAUSE OF ACTION

## Violation of California Constitutional Right To Privacy

70. The Plaintiff hereby realleges and incorporates all preceding paragraphs as if fully set forth herein.

71. The Plaintiff has a right under the California Constitution to privacy of his person and property, and had a reasonable expectation of privacy as to the properties and information described above.

72. Without consent, license or other legal authorization or justification, the Defendants acting individually and in concert, and in a manner that an average citizen would find outrageous, violated the Plaintiff's right to privacy when they committed the searches and seizures above.

73. As a result of the above violation, the Plaintiff suffered damages.

# THIRD CAUSE OF ACTION

## Common Law Trespass and Conversion

74. The Plaintiff hereby realleges and incorporates all preceding paragraphs as if fully set forth herein.

75. The Plaintiff had a property, possessory, leasehold and/or other cognizable interest in the personal and real property searched and/or seized by the Defendants.

76. The Defendants detained, used, possessed, entered, remained, occupied, and/or excluded Plaintiff from the described properties without his consent other legal justification.

77. The Defendants' conduct prevented and interfered with the Plaintiff's use, enjoyment, possession and disposition of the above property.

78. As a result of such interference and deprivation, the Plaintiff suffered damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court grant relief as follows:

a. Award the Plaintiff compensatory damages according to proof jointly and severally as to each and every Defendant;

b. Award the Plaintiff punitive damages jointly and severally as to each and every Defendant;

c. Award Plaintiff the cost of this suit and reasonable attorneys' fees and litigation expenses; and

d. Award such other and further relief as the Court deems proper.

Respectfully submitted,

Dated: January 20, 2020         Signed: _____
                                        Matthew D. Muller

*Via Federal Express*

Matthew D. Muller
1684 Decoto Rd #274
Union City, CA 94587

March 27, 2020

Dear Clerk:

Please accept the enclosed filing. I will send a fee waiver request form under separate cover.

*[signature]*

Matthew D. Muller

**RECEIVED**

APR - 6 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

waiting for fee waiver

JS-CAND 44 (Rev. 07/19)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Matthew D. Muller

**(b)** County of Residence of First Listed Plaintiff  Solano County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
1684 Decoto Road #274
Union City, CA 94587 (In Pro Per)

## DEFENDANTS
County of Alameda; Miguel Campos; Kevan Woods; Rafael Alvarez; Jose Buenrostro

County of Residence of First Listed Defendant  Alameda County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
        THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Unknown

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| 1 | U.S. Government Plaintiff | ☒ 3 | Federal Question *(U.S. Government Not a Party)* |
| 2 | U.S. Government Defendant | 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 370 Other Fraud | 751 Family and Medical Leave Act | 840 Trademark | 460 Deportation |
| | 350 Motor Vehicle | 371 Truth in Lending | | | 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 790 Other Labor Litigation | **SOCIAL SECURITY** | 480 Consumer Credit |
| 160 Stockholders' Suits | 360 Other Personal Injury | 385 Property Damage Product Liability | 791 Employee Retirement Income Security Act | 861 HIA (1395ff) | 485 Telephone Consumer Protection Act |
| 190 Other Contract | 362 Personal Injury -Medical Malpractice | | **IMMIGRATION** | 862 Black Lung (923) | 490 Cable/Sat TV |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 462 Naturalization Application | 863 DIWC/DIWW (405(g)) | 850 Securities/Commodities/ Exchange |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | 465 Other Immigration Actions | 864 SSID Title XVI | 890 Other Statutory Actions |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | 865 RSI (405(g)) | 891 Agricultural Acts |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | 871 IRS–Third Party 26 USC § 7609 | 896 Arbitration |
| 240 Torts to Land | 446 Amer. w/ Disabilities–Other | **OTHER** | | | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | |
| 290 All Other Real Property | | ☒ 550 Civil Rights | | | 950 Constitutionality of State Statutes |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding  2 Removed from State Court  3 Remanded from Appellate Court  4 Reinstated or Reopened  5 Transferred from Another District *(specify)*  6 Multidistrict Litigation–Transfer  8 Multidistrict Litigation–Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Fourth Amendment of U.S. Const.

Brief description of cause:
Action Under 42 U.S.C. 1983 for Damages from Illegal Search and Seizure

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, Fed. R. Civ. P.   DEMAND $   CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes   No

## VIII. RELATED CASE(S), IF ANY *(See instructions)*
JUDGE    DOCKET NUMBER

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)
*(Place an "X" in One Box Only)*   ☒ SAN FRANCISCO/OAKLAND   SAN JOSE   EUREKA-MCKINLEYVILLE

DATE  03/27/2020   SIGNATURE OF ATTORNEY OF RECORD   /s/ Matthew Muller, In Pro Per